Marlene V. MARTIN, Appellant,

v.

MISSOURI HIGHWAY AND TRANS-
PORTATION DEPARTMENT,
Respondent.

No. WD 54311.

Missouri Court of Appeals,
Western District.

Sept. 29, 1998.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Nov. 24, 1998.

Application for Transfer Denied
Jan. 19, 1999.

Mark Roberts, Rebecca L. Leonard, Tyree, Eskew & Roberts, Blue Springs, for appellant.

Judy L. Curran, Kansas City, for respondent.

Before ELLIS, P.J., and LOWENSTEIN and RIEDERER, JJ.

ELLIS, Presiding Judge.

Marlene V. Martin appeals from an order entered by the Circuit Court of Jackson County granting a Judgment Notwithstand-

ing the Verdict to the Missouri Highway and Transportation Commission (MHTC)[1] in Martin's action to recover damages for the wrongful death of her daughter, Christina Kelly.

About 9:45 p.m. on October 18, 1993, Kelly was travelling home to Blue Springs from a restaurant in Lee's Summit, Missouri. The road was wet due to rain. As Kelly traveled down the ramp leading from northbound Highway 291 to eastbound Interstate 70 (I–70), her car skidded nine feet and left the outside curve of the ramp. Her car then spun around and slid backwards down a slope and into a tree 24 1/2 feet off the roadway. A branch from the tree broke through the passenger side window and struck Kelly in the back of her skull. As a result of the head injuries she sustained, Kelly died the following day.

On March 16, 1995, Martin filed a wrongful death action against MHTC in the Circuit Court of Jackson County. Martin's petition claimed that MHTC was responsible for the design, condition, maintenance, and repair of the ramp and that MHTC was negligent for (1) placing trees too close to the traveled portion of the roadway, (2) allowing the trees to remain in a position too close to the roadway, (3) failing to give motorists adequate warning of the existence of the trees, and (4) failing to erect guardrails or other barriers along the outside curve of the ramp. Martin contended that Kelly's death was a direct and proximate result of one or all of these negligent acts.

Trial began on October 21, 1996. On October 25, the jury returned a verdict in favor of Martin setting damages at $150,000 and assessing fifty percent of the fault to MHTC. In accordance with this verdict, on November 5, 1996, the trial court entered judgment in favor of Martin for $75,000.

On December 2, 1996, MHTC filed a Motion for Judgment Notwithstanding the Verdict. On February 27, 1997, the trial court entered an order granting MHTC's motion and entering judgment in favor of MHTC. In granting judgment notwithstanding the ver-

dict (JNOV), the trial court ruled that Martin failed to allege or offer evidence of a defect in the traveled portion of the roadway and that MHTC owed no duty to any motorist leaving the traveled portion of the roadway.

▇▇▇ On appeal, Martin claims the trial court erred in entering JNOV. JNOV in favor of a defendant is appropriate only if the plaintiff fails to make a submissible case. *Jungerman v. City of Raytown*, 925 S.W.2d 202, 204 (Mo. banc 1996). "In reviewing for a submissible case, we view the evidence in the light most favorable to the plaintiff, giving him or her the benefit of all reasonable inferences that can be drawn from the evidence, while disregarding all unfavorable evidence and inferences." *Faust v. Ryder Commercial Leasing & Serv.*, 954 S.W.2d 383, 388 (Mo.App. W.D.1997). "A motion for JNOV should only be granted when all the evidence and reasonable inferences to be drawn therefrom are so strong against the prevailing party that there is no room for reasonable minds to differ." Cole v. *Missouri Highway & Transp.*, 770 S.W.2d 296 (Mo.App. W.D. 1989) *Comm'n v. Kansas City Cold Storage, Inc.*, 948 S.W.2d 679, 685 (Mo.App. W.D. 1997). "Where JNOV is based on an issue of law, the trial court's conclusions are reviewed de novo." *Jungerman v. City of Raytown*, 925 S.W.2d 202, 204 (Mo. banc 1996).

As a governmental entity, MHTC is generally immune from tort liability and suit for compensatory damages for negligent acts or omissions. *§ 537.600* ; *Williams v. City of Independence*, 931 S.W.2d 894, 895 (Mo.App. W.D.1996). However, sovereign immunity is expressly waived for injuries resulting from the negligent operation of a motor vehicle by a public employee within the course of employment or injuries caused by the dangerous condition of the public entity's property. *Kilventon v. United Missouri Bank*, 865 S.W.2d 741, 745 (Mo.App. W.D.1993).

▇▇▇ Martin based her claim for damages on a theory that the tree which was struck by Kelly was a dangerous condition of MHTC's property. In order to state a claim

---

1. At the time the suit was filed, the highway department for the state of Missouri was the Missouri Highway and Transportation Department. Subsequently, that name was changed to

the Missouri Department of Transportation (MoDOT), which is administered by the Missouri Highway and Transportation Commission (MHTC) § 226.007. It is the Commission which

under the dangerous condition exception to sovereign immunity, a plaintiff must establish: (1) a dangerous condition of the property; (2) that the plaintiff's injuries directly resulted from the dangerous condition; (3) that the dangerous condition created a reasonably foreseeable risk of harm of the kind the plaintiff incurred; and (4) that a public employee negligently created the condition or that the public entity had actual or constructive notice of the dangerous condition. *Alexander v. State*, 756 S.W.2d 539, 541 (Mo. banc 1988).

The trial court rested its decision to grant JNOV on a determination that MHTC owed no duty to anyone leaving the "traveled way." The trial court relied on *Williams v. City of Independence*, 931 S.W.2d 894 (Mo.App. W.D.1996), in which this court held that the City of Independence had a duty only to protect drivers from injuries which were reasonably foreseeable and that "an injury is reasonably foreseeable if a 'driver and vehicle normally using the roadway or deviating slightly in the normal use of the roadway will potentially encounter injury from the placement and maintenance of the [condition].'" *Id.* at 896 (quoting *Rothwell v. West Cent. Elec. Co-op.*, 845 S.W.2d 42, 44 (Mo.App. W.D.1992)). *Williams* held that a car crossing the center line of the road, traveling through the opposite lane of traffic, and driving across several private lawns before hitting a headwall eight feet off the road did not qualify as a "slight deviation" from the road. *Id.* at 897. Indeed, *Williams* also contains *dicta* to the effect that driving directly off of the roadway eight feet, down the sloped shoulder, and into the headwall would likewise not constitute a "slight deviation." *Id.* *Williams* follows a line of cases which have held that municipalities and utility companies

were not liable to drivers who deviated more than slightly from traveled portion of city roadways in Missouri. *See, Clinkenbeard v. City of St. Joseph*, 321 Mo. 71, 10 S.W.2d 54 (1928); *Lavinge v. City of Jefferson*, 262 S.W.2d 60 (Mo.App. W.D.1953); *Scaife v. Kansas City Power & Light Co.*, 637 S.W.2d 731 (Mo.App. W.D.1982).[2]

Even were we to find that the principles on which these cases were decided are applicable to the state highway department, none of those cases involved a situation where the public entity assumed a duty to maintain the area adjacent to the traveled way and protect against the dangerous condition which resulted in the injury. "Missouri courts have recognized that a duty may be assumed or undertaken, and when so assumed, a defendant must exercise reasonable care in carrying out the duty." *Bowman v. McDonald's Corp.*, 916 S.W.2d 270, 287 (Mo.App. W.D. 1995); *See also, Kilventon v. United Missouri Bank*, 865 S.W.2d 741, 745 (Mo.App. W.D.1993) ("If MHTC assumed an affirmative duty to implement safety precautions, by contract or conduct, it was liable for injuries caused by unsafe performance of the work . . .").

█ Unlike the cases involving cities and utility companies, the facts of the case at bar establish that MHTC assumed a duty to create safe "clear zones" for motorists. *See Schlueter v. City of Maryland Heights*, 946 S.W.2d 273, 274 n. 2 (Mo.App. E.D.1997). Section 227.030.1 provides that construction and maintenance of the highway system, and all work incidental to that system, is under the general supervision and control of the MHTC. *Summitt by Boyd v. Roberts*, 903 S.W.2d 631, 635 (Mo.App. W.D.1995). Section 227.210.1 provides that "[t]he state high-

may sue and be sued in its official name. § 226.100. All statutory references are to RSMo (1994) unless otherwise noted.

2. The cases dealing with the liability of cities and utility companies to drivers leaving city roadways are based upon *Clinkenbeard v. City of St. Joseph*, 321 Mo. 71, 10 S.W.2d 54 (1928), which held that neither the city nor a utility company were liable to a driver who jumped the curb of a city street and struck a wooden utility pole a few feet off the road because "a city has a right to improve and open for public travel only a portion of a platted street, and . . . is not actionably

liable for injuries to persons using a portion of the street which the city has not undertaken to improve and to open to public use as a pathway or roadway, although such injuries may be caused by dangerous defects therein." *Id.* at 59. Some of the cases following *Clinkenbeard* have gone so far as to read it as stating that as a matter of law municipalities and utility companies do not have a duty to motorists to keep safe any of the area outside the traveled portion of the road. *See Hauck v. Kansas City Pub. Serv. Co.*, 239 Mo.App. 1092, 200 S.W.2d 608, 612 (W.D. 1947); *Noe v. Pipe Works, Inc.*, 874 S.W.2d 502, 504 (Mo.App. E.D.1994); *Godfrey v. Union Elec. Co.*, 874 S.W.2d 504, 505 (Mo.App. E.D.1994).

ways ... shall be under the jurisdiction and control of the commission ... and shall be maintained by the commission and kept in a good state of repair at whatever cost may be required." § 227.210.1. Section 227.060 states that the MHTC is responsible for establishing the width of the right-of-way and the surface roadway of state highways and for determining the type and character of construction. § 227.060. Section 227.220 authorizes the MHTC "to remove any ... obstruction to the lawful use of a state highway, including the right to remove or trim trees located within or overhanging the right-of-way of a state highway." § 227.220. Accordingly, MHTC has control over the surface of the entire right-of-way to the extent necessary for highway purposes to the exclusion of any owner of the fee and is responsible for any cutting or mowing of vegetation growing in the right-of-way necessary for the safety of drivers. *Mispagel v. Missouri Highway & Transp. Comm'n*, 785 S.W.2d 279, 282 (Mo. banc 1990).

■ MHTC was and is a member of the American Association of State Highway and Transportation Officials (AASHTO), formerly the American Association of State Highway Officials (AASHO). AASHTO is a national body made up of the highway departments of all fifty states. AASHTO develops standards and guidelines for the design and maintenance of state highways. Martin submitted several AASHTO documents into evidence.

In 1967, AASHO published guidelines entitled "Highway Design and Operational Practices Related to Highway Safety" ("the Yellow Book"). Recognizing that accidents involving cars leaving the roadway accounted for approximately 65% of all freeway fatalities, the AASHO recommended slopes of 6:1 or flatter[3] when possible and proposed that, to increase safety when vehicles leave the pavement, a clear recovery area, free of all physical obstructions, should be provided along the roadway 30 feet or more from the edge of the traveled way. The Yellow Book further stated:

An intensive crash program to remove roadside hazards on existing streets and highways and to engineer roadsides of new facilities with safety as a major criterion should have a paramount place in the highway program of each State. Only in this way will the motorist who inadvertently leaves the traveled way have adequate protection against death or injury.

\* \* \*

Corrective programs should be undertaken at once to eliminate from the roadside or to relocate to protected positions such hazardous fixed objects as trees, drainage structures, massive sign supports, utility poles, and other ground-mounted obstructions that are now exposed to traffic. Where this is impracticable, an adequate guardrail or other type of protection should be provided.

\* \* \*

Trees of ultimately large trunk size planted too close to the traveled way are potential hazards. Several states are keeping new tree plantings 40 feet or more from the pavement, and are removing trees within 30 feet.

\* \* \*

Steps should be taken immediately ... to eliminate the heavy fixed roadside objects from locations that are especially vulnerable—the outside of horizontal curves, for example. Where aesthetics and safety considerations conflict, safety should be the paramount factor affecting the general appearance of the highway.

At trial, former MHTC officials testified that the provisions of the 1967 Yellow Book relating to clear zones had been adopted by MHTC.

The 1974 version of the Yellow Book continued to prescribe an unencumbered roadside recovery area with a width of 30 feet or more from the edge of the traveled way. The book provided that "[a] coordinated ef-

---

**3.** A 6:1 slope loses one foot of elevation every six feet of distance. Accordingly, a 6:1 slope is not as steep as a 4:1 slope.

fort to provide a forgiving roadside must be made in design, construction, maintenance and traffic control stages of project development if there is to be success in reducing the sizable number of fatal and other serious accidents which occur each year off the roadway." The 1977 AASHTO "Guide for Selecting, Locating, and Designing Traffic Barriers" provided that "clear zone width should be increased on the outside of curves." In 1989, AASHTO published its "Roadside Design Guide" in which it provided formulas prescribing the appropriate clear zone given such factors as the design speed of the road and the slope of the recovery area. Applying the formulas set forth in the 1989 guide, Dr. John Glennon testified that a 64 1/2 foot clear zone should have been provided from the edge of the ramp.

■ While MHTC argues that industry standards do not establish the legal standard of care, "evidence of industry standards is generally admissible as proof of whether or not a duty of care was breached." *Pierce v. Platte–Clay Elec. Co-op., Inc.*, 769 S.W.2d 769, 772 (Mo. banc 1989). MHTC was and is a member of AASHTO, and MHTC officials testified that MHTC had adopted the clear zone provisions found in the 1967 and 1974 Yellow books. MHTC and its employees have a duty to properly design and construct highways. *Heins Implement v. Missouri Highway & Transp. Comm'n*, 859 S.W.2d 681, 695 (Mo. banc 1993). Under the standards established by AASHTO and adopted by MHTC, and the authority granted over the right-of-way by statute, this duty includes the proper design, construction and maintenance of "clear areas."[4] The evidence presented at trial sufficiently established that MHTC had a duty to maintain clear areas. Whether MHTC was negligent in the manner it did so is an issue properly left to the jury.

■ MHTC claims that any duty it might have had with regard to clear zones was limited to new projects started after it adopted a clear zone policy in December of 1966 and to the dictates of its maintenance policy which provides, "On all routes any growth of new trees on the right-of-way and within 30 feet of edge of pavement should be cut. Mature trees should be cut only if dead or determined to be in an extremely hazardous location." The mere fact that these provisions exist establishes that MHTC assumed some duty to maintain clear zones to remove some dangerous trees from the right-of-way. *See Oldaker v. Peters*, 869 S.W.2d 94, 100 (Mo.App. W.D.1993) (holding that MHTC could be held negligent under the dangerous condition exception to sovereign immunity for violating its design manual and not providing the lighting prescribed by the manual). However, MHTC claims that the tree involved in Kelly's accident was neither dead nor "extremely dangerous," and therefore, it cannot be held to have breached its duty.

■ Whether a defendant created a sufficiently dangerous condition is ordinarily a question of fact. *Sheppard v. McFadden Lighting Co.*, 816 S.W.2d 12, 14 (Mo.App. E.D.1991). The evidence presented at trial established that the trees along the outside of the ramp were actually planted by MHTC in 1966 in response to the Federal Highway Beautification Act. The placement of the trees was determined by a MHTC engineer. The tree involved in the accident was placed 24.5 feet from the roadway. While the ramp had been designed to have a "recoverable" 4 to 1 slope, Dr. John C. Glennon testified that the slope leading to the tree had a steeper, non-recoverable 3.1 to 1 slope.[5] The testimony and evidence presented at trial reflect that at the very least, MHTC recognized the need for a 30 foot clear zone. In a MHTC interdepartmental memo which was admitted into evidence, the MHTC acknowledged, as reflected in the AASHTO literature, that "[h]orizontal curvature will increase the likelihood of a vehicle leaving the travel way and will increase the distance it will travel" and that slope plays an important role in clear

---

**4.** One of the "primary purposes for the proper design of roads and highways ... [i]s safety." *Nagy v. Missouri Highway & Transp. Comm'n*, 829 S.W.2d 648, 652 (Mo.App. E.D.1992) (citing *Donahue v. City of St. Louis*, 758 S.W.2d 50, 52

(Mo. banc 1988)). MHTC has a duty to design safe roads. *Id.*

**5.** Anything less than a 4 to 1 slope is not considered to be a "recoverable slope."

zone determination.[6] The tree that killed Kelly was located less than thirty feet from the roadway on an unrecoverable slope at a curve where two accidents had occurred in the previous month. Dr. Glennon testified that the location of the trees on the slope made the ramp dangerous and created "definitive accident potential." Thus, even were we to find that MHTC only assumed a duty to remove "extremely dangerous" trees, the evidence is sufficient to establish that the tree was in an "extremely hazardous" location and that MHTC violated its own maintenance policy when it failed to remove it.

MHTC offers two additional arguments, originally set forth in its motion for JNOV, which it claims supports the trial court's grant of JNOV. "We will affirm the trial court's judgment if its decision is supported by any one of the grounds set forth in respondent's motion for JNOV." *Faust v. Ryder Commercial Leasing & Serv.*, 954 S.W.2d 383, 388 (Mo.App. W.D.1997).

■ First, MHTC claims Martin failed to make a submissible case that the tree constituted a dangerous condition under § 537.600. As noted, *supra*, in order to state a claim under the dangerous condition exception to sovereign immunity, a plaintiff must establish: (1) a dangerous condition of the property; (2) that the plaintiff's injuries directly resulted from the dangerous condition; (3) that the dangerous condition created a reasonably foreseeable risk of harm of the kind the plaintiff incurred; and (4) that a public employee negligently created the condition or that the public entity had actual or constructive notice of the dangerous condition. *Alexander v. State*, 756 S.W.2d 539, 541 (Mo. banc 1988) (citing § 537.600.1(2)). Martin clearly presented evidence sufficient to establish all of these elements.

Under Missouri law, the state highways are under the jurisdiction and control of the MHTC. *Summitt by Boyd v. Roberts*, 903 S.W.2d 631, 635 (Mo.App. W.D.1995) (citing

§ 227.210). Section 227.030.1 provides that all construction and maintenance of Missouri's highways, and all work incidental to the highway system, is under the general supervision and control of the MHTC. *Id.* The ramp leading from Highway 291 to I–70 is public property, and the tree involved in the accident was planted and maintained by MHTC.

■ A dangerous condition may be established by an intrinsic defect in the property or by the dangerous positioning of various items of property. *Alexander v. State*, 756 S.W.2d 539, 542 (Mo. banc 1988); *See Jones v. St. Louis Housing Authority,*, 726 S.W.2d 766, 774 (Mo.App. E.D.1987) (holding that the presence of debris on the public entity's yard was a dangerous condition of the property, and sovereign immunity did not bar the wrongful death claim of a mother whose son was struck by debris flung from a mower being used on the premises). "Whether defendant created a dangerous condition is ordinarily a question of fact." *Sheppard v. McFadden Lighting Co.*, 816 S.W.2d 12, 14 (Mo.App. E.D.1991).

The evidence presented at trial sufficiently supports a finding that the placement of a tree less than thirty feet down a non-recoverable slope constituted a dangerous condition. Witnesses for MHTC admitted that highway engineers recognize that sooner or later motorists are going to leave any given roadway they design. Dr. Glennon testified that while the ramp had been designed to have a "recoverable" 4 to 1 slope, the slope leading to the tree had a steeper, non-recoverable 3.1 to 1 slope.[7] Dr. Glennon testified that in 1967 the American Association of State Highway and Transportation Officials (AASHTO) had published guidelines calling for at least a 6 to 1 slope and a thirty foot clear area. Dr. Glennon testified that, under the newer standards recommended by the American Association of State Highway and Transportation Officials (AASHTO) in their 1989 design manual, given the slope leading to the tree

---

6. The memo further provided, "It is important in the implementation of the clear zone concept that the clear zone distances should not be used as boundaries for introducing roadside hazards such as bridge piers or trees. These should be as far from the travel way as practical."

7. Anything less than a 4 to 1 slope is not considered to be a "recoverable slope."

and the design speed of the roadway, a "clear zone" of 64 1/2 feet should have been provided from the edge of the ramp to provide errant motorists a chance to recover control of their vehicles. Dr. Glennon concluded that the site of the accident "was a hazardous location because of the placement of the trees close to the roadway on this steep slope." Dr. Glennon testified that the placement of the trees on the slope made the ramp dangerous and created "definitive accident potential." This evidence was sufficient to send the issue to the jury. *See Beyerbach v. Girardeau Contractors, Inc.*, 868 S.W.2d 163, 165 (Mo.App. E.D.1994).

Likewise, the evidence established injuries sustained by Kelly were reasonably foreseeable in light of the nature of the dangerous condition. Her car left the roadway and struck a tree within thirty feet of the roadway. This is precisely the type of injury sought to be prevented through the establishment of clear zones.

■ Martin also presented sufficient evidence that Kelly's injury directly resulted from this dangerous condition. "The test is not whether a reasonably prudent person would have foreseen the particular injury but whether, after the occurrences, the injury appears to be the reasonable and probable consequence of the act or omission by the defendant." *Oldaker v. Peters*, 869 S.W.2d 94, 100 (Mo.App. W.D.1993). "The negligence of the defendant need not be the sole cause of the injury, as long as it is one of the efficient causes thereof, without which injury would not have resulted." *Id.* The evidence clearly established that Kelly's car had slid off the road, down an unrecoverable slope, and into the tree. Investigating police officers testified a branch from the tree caused Kelly's fatal head injuries. Kelly's treating physician testified that her death was caused by skull fractures and trauma to her brain. This evidence sufficiently established that

Kelly's death resulted from the injuries she sustained when the branch from the tree crashed through the back passenger window and struck her in the skull.[8] The jury could reasonably infer that but for the presence of the tree that close to the roadway, Kelly would not have suffered her fatal head injuries.

■ Lastly, the evidence established that employees of MHTC planted the trees and that MHTC had notice of the dangerous condition in sufficient time to protect against it. The ramp itself was designed early in the 1960s. Construction began in March of 1964, and the ramp was opened for use at some point between December of 1965 and October of 1966. In 1966, as part of the Federal Highway Beautification Act, MHTC planted nine trees on the outside of the ramp in locations designated by a MHTC engineer. In 1967, recognizing the danger posed to motorists leaving highways, the American Association of State Highway and Transportation Officials (AASHTO) began recommending "clear zones" next to highways. Witnesses for MHTC admitted that MHTC was a member of AASHTO and had adopted AASHTO's recommendations regarding thirty foot clear zones. Thus, as of 1967, it is reasonable to infer that MHTC knew that the recently planted trees existed and that they did not comply with the prescribed clear zone. In addition, a MHTC maintenance worker testified that he helped plant the trees and was at the site and observed the trees on many subsequent occasions. Consequently, MHTC had constructive knowledge of the trees and their non-compliance as well.[9]

Martin presented sufficient evidence on all elements necessary to establish a dangerous condition under § 537.200(2).

■ Finally, MHTC argues that the trial court did not err in granting JNOV because

---

**8.** The fact that Kelly's negligence also lead to her injury does not serve to defeat Martin's claim. *Cole v. Missouri Highway & Transportation Comm'n*, 770 S.W.2d 296, 299 (Mo.App. W.D. 1996).

**9.** A public entity is deemed to have constructive knowledge of a dangerous condition if the dan-

gerous condition is of such a nature that, even though not obvious and notorious, it has existed for such a length of time that the public entity in the exercise of ordinary care could and should have discovered and remedied it. *Lockwood v. Jackson County*, 951 S.W.2d 354, 357 (Mo.App. W.D.1997) (citation omitted).

it established that it was entitled to the state of the art defense in § 537.600.1(2). The language relied on by MHTC provides:

> In any action under this subdivision wherein a plaintiff alleges that he was damaged by the negligent, defective, or dangerous design of a highway or road, which was designed or constructed prior to September 12, 1977, the public entity shall be entitled to a defense which shall be a complete bar to recovery whenever the public entity can prove by a preponderance of the evidence that the alleged negligent, defective, or dangerous design reasonably complied with highway and road design standards generally accepted at the time the road or highway was designed and constructed.

§ 537.600.1(2). MHTC notes that the 1954 AASHO "Policy on Geometric Design of Rural Highways" provided, "Trees should not be planted close to the traveled way [and] should be offset at least 15 feet from the edge of pavement." MHTC also notes that the 1965 AASHO "Policy on Geometric Design of Rural Highways" provided that "[t]rees should not be planted close to the traveled way [and] should be offset at least 25 feet from the edge of the pavement and 20 feet from the edge of ramp pavements." MHTC claims that its compliance with these standards establishes that it complied with the highway design standards of the time and, accordingly, it is entitled to the benefit of the state of the art defense.

MHTC's argument misses the mark. The state of the art defense applies to claims relating to the design of the highway. The ramp was designed in the early 1960s, and construction began in 1964. The ramp opened for use sometime between December 1965 and October 1966. However, Martin's claim was not based on the original design of the ramp.

The tree involved in the accident was planted in 1966 as part of a separate program to make the roadside more scenic. Subsequent to planting the trees, MHTC adopted the clear zone principle and thereafter a maintenance policy requiring the removal of trees in extremely hazardous locations. The latter policy encompassed the tree with which Kelly's car collided. Missouri law is clear that liability may be imposed upon one who is under no duty to act but does so voluntarily or gratuitously. *Brown v. Michigan Millers Mut. Ins. Co., Inc.*, 665 S.W.2d 630, 634 (Mo.App. W.D. 1983). By assuming such a duty, MHTC abandoned any state of the art defense that might have otherwise existed with regard to the tree.

Having considered the evidence in the light most favorable to Martin, we find that she presented a submissible case. Accordingly, the trial court erred in granting MHTC's motion for JNOV. The judgment of the trial court is reversed and the cause remanded with instructions to re-enter judgment in favor of Martin for $75,000.

All concur.